Case number 14-6305 Mingo Logan Coal Company Appellant v. Environmental Protection Agency Mr. Clement for the Appellant, Mr. Littleton for the Appellant Good morning. Good morning, Your Honors, and may it please the Court. In the first instance, the EPA has the rather extraordinary power to exercise its 404C veto over a core permit even after the permit has issued. This appeal concerns the distinct question of whether the EPA's exercise of that extraordinary post-permit authority is subject to any additional constraints relative to EPA's exercise of that same authority pre-permit. The EPA takes the remarkable position that its ability to withdraw a specification post-permit, even when it will eliminate 88% of the disposal sites specified in the permit, is just as unbounded as its authority to act when there is no permit, no reliance interests, no prior 404B analysis by the Corps, and no earlier decision by the EPA, whether implicit or explicit, not to employ its statutory veto. We find that position astonishing, but more to the point, it's deeply flawed as a matter of administrative law. By failing to account for the reality that the permit in fact issued, in no small part because EPA declined to exercise its 404C veto, EPA failed to address important aspects of this problem. And the reality is that when the Corps looks at the decision on whether to exercise its 404C authority, and it considers exercising that authority after the permit is already issued, there are just a number of factors that become relevant in that post-permit context that obviously wouldn't have been relevant in the pre-permit context. And to take the position as EPA does, that no, it's the same analysis, we don't have to take that stuff into account, is a classic arbitrary and capricious mistake because it fails to account for an important aspect of the problem. And just to pick to what seems to me to be the most obvious factor, just as one, is ours are going to know something in the post-permitting process that you don't know in the pre-permitting process, which is whether the permittee has complied with the various specifications of the permit, which may be critical to mitigation efforts. Now I'm not focusing on that because I think it's the most important one, I'm just focusing on it because those factors just don't exist in the pre-permit context. And of course you'd want to take those into account. They might not outweigh the other factors. And again, the other factors, it seems to me, would also be profoundly different in the post-permit context. I mean, I do think that The statute speaks in terms of unacceptable adverse effect in talking about the so-called veto authority. The statutory terms don't themselves draw a distinction between pre-permitting and post-permitting. Well, I think it's fair to say that the statute doesn't expressly address the post-permit context, which is why it's sort of silent on that issue, which is why the first time up here we were arguing strenuously, and in my heart of hearts I still think correctly, so far, that that authority doesn't exist at all. But the point here is that the term unacceptable is clearly capacious enough to take into account the difference between the two circumstances. And so the question is now no longer a statutory question, it is an arbitrary and capricious question. And I do think it is classically arbitrary and capricious to basically say, no, whenever means whenever and sort of means whatever, so we're just going to proceed just as if this permit has an issue, that there's not reliance interest, that there's not a compliance history, and there's no obligation, as the district court clearly held, to even sort of differentiate between substantial new information and pre-existing information. So how should it be different? So it should be different, but how exactly? So I think what you're asking for ultimately is a remand to EPA for them to do a balancing of all the different factors. How do you envision that going? What do you want them to do? Well, I envision it going well, Your Honor, but I think... What do you want them to do? I think a great starting point would be the factors that the court looks to in deciding whether to revoke a permit. And I say that not because I think that those provisions directly apply to EPA. I get the fact that they don't. But I do think they are actually a great indicator of what the government itself, when it was thinking about this as a global matter, not in the context of a specific permit, would take into account in deciding whether to change course. And so you look to, is there a change in it? And I should parenthetically add, and they don't look that different from what you'd expect courts to take into account, for example, in a 60B context or any context when you're reconsidering a decision. So you look to, is there a substantial change in the law? Is there a substantial change in the facts? Substantial new information? Are there reliance interests here that are uniquely taken into account? And what is the permit compliance record of the permit date? Can I ask you about... So in the briefing, you focus a lot on reliance interests. You lead with reliance interests, and you focus on that to a great extent. So where did the company tell the EPA, as part of the EPA process, about reliance interests and investment-backed expenditures? It did it... I mean, we really sort of try to catalog a variety of places that we did that in our reply brief. Right. And I looked at those. Right. And in terms of what was put before the EPA, I saw one sentence in one response to, I think it was the recommended... Maybe it was the proposed determination. I think it was on JA 708, I think. And it was a sentence in the introduction to that document which just said... I'm trying to look to see if you may remember exactly what it says. Now more than three years after the issuance of the permit, Esmingo Logan is actively mining the sites in an attempt to recoup its decade-long investment. EPA has declared that the impacts it had proved are now unacceptable. So that is a sentence in the introduction to this document, and we can talk about exactly what it says. But are you aware of any other sentence or clause or any documentation of what the reliance... How the reliance interests can yield in terms of investment-backed expenditures? Well, I guess what I would say is a couple of things, Your Honor. First of all, you've got to take this in the context that before the EPA and before the district court in the first instance, my client is making both the statutory argument and the arbitrary capricious argument. And I don't think there's any doubt in the context of making the statutory argument that the reliance interests are front and center. Before the EPA? Yes. What did the company put before the EPA in terms of reliance interests? In terms of detailing them or in terms of invoking them? Either, other than this sentence. Well, I'm not in a position at the podium. I'll try to get you more, but I'm not suggesting that there's a ton of stuff we left out of the reply brief on this. Right. And in the reply brief, in terms of what was put before... I guess this is why I focused on what was put before the EPA, because we have these decisions, as you know, that say that if you don't put something before the agency, then we're not in a position to give credit to that argument because the agency had to have a chance to deal with it. And as far as I could tell from the reply brief, in terms of what was put before this agency, the EPA, the only thing I saw was this sentence. Well, I... If that's all, then I don't... I'll try to give you some more citations in my rebuttal if I can, but I also, with all due respect, don't think you're looking at it exactly the way I would suggest that you look at this, because the one thing that's clear, the reliance is just part of the broader set of arguments about why there has to be a different analysis post-permit than pre-permit. And I don't... I think it's an important aspect of it, but I don't think it is the sum total. And, you know, in some respects, as I said, it's not even the most obvious. Reliance is the reason that you want heightened justification from EPA, right? In other words, post-permit's different from pre-permit. And the reason it's different is because, obviously, you spend money, once you get the permit, in reliance on the permit, and it's a change, and so you want a heightened justification. Exactly. That's what I was thinking. But then the question is, okay, here's my next question, which is, when EPA does what they're going to do, as you envision it, do they need to... why aren't they limited to just environmental considerations? In other words, they might have to find new information on the, as you say, because they have a heightened justification because it's reliance, but do they have to look beyond environmental considerations? Absolutely, Your Honor, and I think... And common sense and... Although... I mean, you know, all of those factors together, and, you know, I guess I want to make two points before I leave Judge Srinivasan's sort of concern about preservation. I mean, I think if you look at the EPA's own brief at page 48, what they say is they concede that Mingo Logan argued, quote, argued to EPA and the district court and argues again on appeal that the agency must supply a more robust justification for a post-permit action. Now, I think this is the gravamen of the claim. I think of, like, reliance and compliance history, those being sort of separate arguments that support the basic claim in sort of a city of Escondido against ye kind of sense. So I really think that's enough to have preserved this claim. And again, I don't think this is a case where the agency's in a position to say, well, if only you've made more of that, you know, we would have done something different. I mean, there's... Can I just ask you one more? Sure. So I know that you've got things broader than reliance interest, which you want to get to, and I don't want to stop you from doing that. But reliance interest is what you fronted. And on the question of reliance interest, it seems to me that it's not just enough to say reliance interest, it's obvious, you know, there's reliance. Because the point is, and I think this happened in Michigan, those things were quantified. Because in order to... You can have situations in which there are no reliance expenditures, because if the veto happens the day that the permit's issued, it's a fact that there's nothing, right? Right. So it seems to me that it's incumbent upon the company to point out to the agency, here's the ways in which we've relied, here's an affidavit or some record evidence on the expenditures that we've made, and then the agency's... It's flagged for the agency that they need to take that into account in the analysis. Otherwise, what's the agency supposed to do? They can't divine that. But here's the thing, Judge. Yeah. Your Honor, it's... I mean, obviously when we got to the district court and we had somebody that was at least potentially willing to take those into account, we put in the affidavit. Before the agency, it was clear then, and it is crystal clear now, that they're not taking it into account. This is, as I was about to say, this is not a situation where EPA can really come up here and say, gosh, if only you had put in another affidavit and quantified that, we would have run the numbers and we would have balanced this against that. Their position is they don't have to at all. And so it seems to me that in that context... If the agency says it's not going to take something into account, then the company is... Or the entity is absolved from any responsibility to still put it before the agency in order to preserve it. Because, I mean, in Michigan there were things that were submitted about that, and I don't think there was any dispute that the agency wasn't going to take it into account. Well, I mean, I don't know that I necessarily agree with you, Your Honor. I mean, I don't think that when the agency is clear that it's not going to take something into account, that you have to proffer it in some sort of preservation way. I don't know that the case will support that. But I also think it's critical that the broader issue about whether you have to take into these a variety of factors... Any of the factors. Yeah, because it's now a different day, because this is no longer an initial decision to exercise the 4043 veto, but it's now a post-permit exercise of that authority. The broader argument that you have to deal with that differently because it's a new day, new considerations, that clearly was preserved. Now, I do think unacceptable is a broad enough term to take that into account. So this is not a situation where you have a statutory term like you had in Whitman that made it clear that this is just a one-way ratchet. All you're supposed to consider is this. I also think... If it's that severe adverse effect, it might be different. Well, I think you'd still have to look contextually about whether EPA is really only supposed to sort of like... I mean, you can have a context, and this may or may not have been Whitman, but you'd certainly imagine a situation where EPA is really supposed to do something that's more like aspirational. So they're really just supposed to see what would be ideal for the environment, never mind anything else. But here, especially with a term like unacceptable, and then with the context of the permitting process, it does seem that clearly they can take into account cost considerations, they can take into account the feasibility of mitigation, they can take into account a variety of factors. So what comes in under cost when it goes back to EPA? It's obviously the cost that your client expended, but is it broader than that? Is it lost jobs? Is it loss of a supply for cheaper electricity? Is that supposed to be part of the analysis too? I think all of that can be part of the analysis. And again, I think that obviously, I think if you sent this back to the agency and you had a remand, the reliance interest would be, I think, front and center. I think some of these other costs might be part of the calculus, but to the extent the agency has a justification for discounting those costs or emphasizing other factors, I mean, you know, if they do the analysis that you would expect them to do to take into account the reality that this is a substantially different context because of the permit, at that point, they're going to get deference in judicial review of the analysis they do. I think the problem here is they just, you know, and not unintentionally, they've taken the position that we just don't need to look at that. It's really just the same analysis. And there's one other contextual point there, is that if you think about the way the 404C process works, the read permit, although, you know, I won't take issue with the idea that the EPA gets to exercise a veto, it's still in the context of an interagency process where the Corps has got the lead role. If there's a dispute about the environmental materials between the Corps and the EPA, they're supposed to take it up with CEQ. So there's a variety of things that sort of practically constrain the EPA. And I do think if they're going to assert this authority to exercise the 404C authority after the fact, I mean, the analysis has to take into account sort of some of the same things that would be almost like a proxy for what those other people would be injecting into the interagency process. And I don't mean that in, like, some super rigorous way. I just think it's part and parcel of this idea that you're just in a vastly different world. Now, even post-treatment, I think, the statute still requires consultation with the Corps, I think, right? Is that right? I think that's right. But just to be concrete, and again, this isn't something we've focused like a laser beam on the briefs. It's just an illustration of the basic point. But at the very end of this 99-page opinion by the EPA, they start talking about the 404B analysis that the Corps is supposed to do and the mitigation measures. And I would have expected an agency in that context would start off the analysis by saying that, boy, the Corps looked at these exact same 404B factors before it issued this permit, and here's what they found, or here's what their thinking was, and here's why we come to a different conclusion three years later, five years later, whatever it is. And that's not the analysis. The analysis is, here's 404B, here's our, you know, take these into account, here's our best factor. We've obviously been talking a lot about the argument that I think is the most important. But I do want to just briefly mention that almost the same thing happened when it came to the downstream water effects. Because I would think in a case like this, where you have a state that has delegated authority under 402, and the state has not just issued a 401 permit at the beginning of the process to say this is going to be consistent with clean water attainment in our state, but then specifically at the discharge from the sediment pond point, where you need a 402 permit, where Corps Alaska says you need that. At that point, the state has granted the permit. Now, again, we're not going to take the position that that stops EPA from exercising its 404C authority, even based on downstream effects. But, jeez, you'd expect the analysis to start with... Cognizance of it. Absolutely. And, you know, it would really, more than just cognizance, like, it ought to be the beginning focal point at which there's a justification for why we're coming out differently. And if you look at the downstream water effects part of this opinion, it's 24 pages long. I tried to re-read it this morning. There's no reference to... I mean, you know, the only reference to the sort of state water standards at all is at Joint Appendix 842, where the EPA averts to the fact that EPA's conclusion of adverse effect on wildlife is not dependent on a conclusion that West Virginia's water quality standards will be violated downstream of the site. So, the only time they really avert to even West Virginia's water quality standards is to reaffirm that they're not actually relevant to, or outcome any reference to the fact that applying those standards to the specific discharge point when this process got to the sediment ponds and then discharged downstream, that West Virginia's given it a thumbs up. And, again, the point is not that West Virginia gets the final say. It's just that, wow, you'd expect that to be... So, there's two things that are missing here. You'd expect that the starting point for the exercise of the veto would be the reality that the Corps already gave a green light to this project. And then, as to downstream effects, you would expect the starting point would be the fact that West Virginia gave a 402 permit. And if I could say one word about the sort of the 5C analysis of the opinion, which is to say the effect on the fill site, there it's where I think the failure to rigorously look at substantial new evidence versus just evidence really is kind of powerful, because the only thing that the EPA really points to at the fill site that is based on a post-permit study is one study about salamanders that says that when you fill a headstream, the salamanders don't come back. Now, I might have thought that was obvious, but in all events, it's not clear to me that that's the kind of substantial new evidence that ought to justify this post-permit exercise. If they come back and they have a study that says, wow, there were like six different types of salamanders there, and we didn't even think about those there, or if they make a finding that this Louisiana water thrush actually goes to the site for the first time, that might be the kind of substantial new evidence that gets you to a different place. So one way to look at this, and this is getting ahead, but is given the costs, the reliance interests that are inherent in a post-permit revocation, the EPA is going to have to show greater environmental benefits. And your point is they have to be benefits that were not known at the time of the original decision, and they have to be high level of environmental benefits as well. And my question is, can they also say, however, and in doing this, we have a different view of the previously known evidence than did our predecessor agency, or is that not an appropriate part of the analysis? Well, I guess what I would say is I would take the position that that's not an appropriate part of the calculus. My friends at the EPA might take a different view of that, and maybe that's the third time this case comes before this court. But I do think that that's a bit That's what I do think. I think if this court emphasizes the need to consider the fact of the permit as being a game changer, I don't think you're opening up some new vista in administrative law, because permits, especially a permit like this, I mean, they are different. It's not just the agency saying that's Well, so what you're really saying, I think, is that you need new information, and it has to be game changing new information on the environmental side, given that there are going to be a lot of costs, almost inevitably, on the other side of the ledger. Well, I wouldn't go quite that far, because, again, you're going to have a variety of different circumstances. I do think the compliance history, for example, is something that could easily be factored into account in some cases, not this one. But you can imagine a situation, for example, where the permit is granted with a lot of specifications, not about disposal to enforce a mitigation program that was the critical thing that got EPA comfortable with not vetoing the permit in the first place. And then you have a permittee that just blows all of those limitations. I mean, that's going to be an easy situation where even exercising the authority post-permit and taking factors into account, you're going to be able to, the agency is very permissibly going to come out in a different voice. Of course, that would be new information not known at the time the permit was granted, and significant new information. Sure. I mean, or you could certainly have a situation in which the EPA, in the course of the pre-permitting process, makes known its objections, or at least concerns. I won't call them objections, because it can always veto before the fact, too. Makes known its objections, makes known its concerns, and then just doesn't have the information yet to reach a final resolution of those concerns. But then the court goes ahead and issues the permit, and in fact, the EPA can look and say, well, now we've had more of an opportunity to explore this. We have more information, and we realize that these concerns actually are realized. Well, every case is going to depend a little bit on the record in the case. I mean, if it were no more than sort of EPA had these concerns all along, but they just kind of couldn't get the paperwork together, I mean, that's... The analyses just weren't done. Well, you know, this, I mean, here's a good example, right? Because this was like a 10-year permitting process. You had an environmental impact statement that was put together. There was lots and lots of analysis done. The EPA had some concerns at various junctures. At various junctures, my client took steps to address those concerns. And, you know, if there was some lingering concern, I really think that the far better answer for the whole system would be let's hold off granting the permit. Because the permit is, I think, and continue to think, is a big deal. It is, you know, it is a watershed event. And it should therefore have a significant impact on how the EPA exercises its authority post-permit. And I guess my clients would rather live in a world where it's all recognized that the permit is a very big deal, that the EPA has this residual authority, but it's limited because it has to take into account these factors, such that the incentive for the EPA is if you have these concerns and they're lingering, boy, do the paperwork or take it up with CEQ if you, you know, because there's two dynamics, right? And, I mean, the political dynamics are a little bit different. For, you know, the Corps has its own veto authority, but I would imagine to actually use that is sort of costly in a lot of different senses, internally, externally, to use that authority. It also has the authority in more of a cooperative interagency way to take issue with the way the Corps is doing the 404B analysis. And particularly if you're sort of in, you know, the area where some of these concerns are there and there's a back and forth. But my clients, I think, would much rather live in a world where permits take an extra six months or an extra 12 months and all of that issue, but they're kind of not worth the paper they're printed on. But at least everybody would know. I mean, I'm hypothesizing a situation in which everybody's on notice because of the nature of the correspondence and because that's all laid bare, where the Corps goes ahead and issues the permit, but the EPA has flagged, we've got some concerns, they're not completely resolved, we're not going to exercise the power to stop the permit in its tracks right now, but, you know, proceed at your own peril. You know the way the land, that's... Right, and I'm just saying, I'd rather not live in that world. Yeah. I mean, and maybe, you know, administrative law doctrines don't give me the choice. Right. But I do want to say, I think there is playing the joints here in terms of interpreting this regime. I do think that, you know, like I said, you know, the whole notion that the 404C authority exists we no longer take issue with, but when it's being exercised in the post-permit context, you know, I'd much rather live in a world, even prospectively, that says that authority is, it exists, but, you know, it's going to be flyspecked a little differently than when it's used in the pre-permit context, and if that makes EPA fight a little bit harder in the pre-permit process, you know, we'd rather live in that world because, you know, the whole idea, again, of a permit is it's not just the agency's position, it really is a green light, and to go from a green light, an affirmative green light, to an absolute red light, we think should take, you know, substantially greater justification, and again, I'm repeating myself, but I think that's a much better world prospectively for, certainly for the regulated community, and I'm not so sure it's not a better world for EPA, but they'll tell you differently. Thank you. Thank you. Good morning. Good morning, Your Honor. Matt Littleton representing the EPA. May it please the Court. I'd like to start with what is the most straightforward way for this Court to affirm the judgment of the District Court, and that is to hold that as a matter of statutory construction, EPA may consider downstream effects of discharge of fill material on wildlife, and that is quite clear from the structure of the Clean Water Act. The Court can consider those effects, EPA can consider them, whether it's pre-permit or post-permit, and the sporting may go, Logan, seems to be giving up the statutory argument and making more of a sort of arbitrary and indicate where there are departures from specific state water quality standards. The problem is that that... I didn't hear him give anything off, but you can keep going. Well, so let me get back then to the statutory argument. I think it's quite clear that under Section 404, the Court cannot issue a permit unless the state certifies under Section 401 of the Clean Water Act that there's been compliance with state water quality standards, but the Court has the ability to reassess water quality itself, and EPA has the ability, obviously, under Section 404C to make the determination that notwithstanding that certification, there's an unacceptable adverse effect on wildlife, and therefore make its own determination independent of the floor set by state water quality standards. So there hasn't been interference with state water quality standards in any respect. The Clean Water Act has distinct authorities for states and for the federal government, both the Corps and the EPA, and all EPA is doing here is exercising the authority that was expressly given to it by Congress. But their larger point, as you know, is that whatever the environmental benefits are, they have to be weighed against the costs, including the costs that were invested in reliance on the permit. So first of all, I want to make clear, that's a separate argument, and that's the argument they lead with, although it's an argument that they plainly did not preserve either before the EPA or before the District Court. They clearly said before the District Court that because it's a change, a revocation of a permit, you need a heightened justification citing State Farm. So what I point the Court to, the clearest place where this absence of preservation comes out, is in Mingo Logan's brief on remand back from this Court. Yeah, what page? That's what I'm looking at. It's the, I think, I guess I would point to the entire document. Well, page 14 specifically says, a change in course requires reasoned decision making citing State Farm in cases of this Court, reaching one conclusion before permit issues and then reaching the opposite conclusion on the same information as the very definition of arbitrary and capricious. That's the classic State Farm argument of, also elaborated in Fox, of when you make a change in course, you have to explain that change. Well, I would respectfully say that that's a different argument that Mingo Logan raises, and we don't contest that that point has been waived. But the question whether EPA had to consider these specific factors, such as compliance history, that was clearly not preserved. And I think under the Supreme Court's decision in Vermont Yankee, it's quite clear that you can't just make a generalized arbitrary and capricious claim and have that preserve an issue either before the agency or the District Court. I think the starting point is, because it's a post-permit revocation, there are reliance interests inherently in that situation, and it's a change in course under Fox. And you need, as Fox says, a more detailed justification than for the decision in the first instance. Well, what I would say on that, two points on that. Then we'll go to what the more detailed justification needs to be. But I want to nail down step one. So two points on that. First of all, Your Honor said it was inherent. And I think the record in this case makes clear that with respect to the specific disposal sites withdrawn, which were not all of the disposal sites in the permit, what was indicated from the record, and this is at JA 866 in EPA's final determination, is that the reliance interests, to the extent they existed, the one sentence in the introductory, in the introduction to 250 pages of comments from Ingo Logan, to the extent those interests existed, they were permit-wide, and what EPA was doing here was not withdrawing all the specifications in the permit. It was only withdrawing specifications for sites that had not been discharged into since the permit issue. Well, I thought it was more than that, because at the time that the, how soon after the permit issued did the other District Court litigation start? It was within a week. And then in that litigation, at what point was there an agreement that said that we're not going to go forward except at the spank, spanks on the same day? I believe it was three days after the complaint was amended. So virtually immediately after, and this is, this. That doesn't mean that there couldn't have been. It does not. But there needs to be evidence of that. And there is no evidence of that in this record. All we have is one sentence, again, in the introductory comments that Ingo Logan made. And with respect to the. In response to that, what about the point that was raised by your colleague on the other side, that your own approach takes all that out of the field of vision? So it wouldn't have done the company any good to itemize investment-backed expenditures because it was already clear that you weren't going to take those into account. So. Well, I guess I would say two things on that. First of all, this Court can only reverse an agency decision based on the record before the agency. So if it turns out that EPA might have taken these things into account had they been introduced, the Court couldn't remand on that basis. EPA has to deal with the record that's before it. But second, I think you're getting to the question. I suppose the way I would put it is this. There's sort of two questions. One is, what are the considerations that are valid to take into account in determining whether there's an unacceptable adverse effect on wildlife? And here are the two polls for the Court to look at are Michigan on the one hand and Whitman on the other. Mingo Logan says this is like Michigan where there's a broad, capacious grant of authority to regulate wherever appropriate and necessary. Then on Whitman, you have the agency must regulate within an adequate margin of safety. And despite the presence of the word adequate, which here I would argue is akin to acceptable or unacceptable, the Court in Whitman unanimously said that does not encompass necessarily a consideration of cost. I get that argument that there's a spectrum. And you would say that this falls somewhere in the middle and closer to Whitman than to and maybe all the way to Whitman would be your position. But let's just assume arguendo, just assume arguendo that we're in the Michigan universe. Then the question becomes, what does the company need to do to adequately put forward the Michigan argument? Well, I think the company, number one, needs to actually make the argument and say in the context of an adversarial proceeding, which effectively this was, to say, EPA, here are these interests. Here's what we've spent. Here's the money we've spent on this that we're not going to be able to recoup. You need to consider this and take that into account. So certainly it needs to do that. It did not do that here. As is clear, we have one sentence. But secondly, I think there's a separate question here as to what the agency needs to consider section 404C is about as specifically spelled out in the statute as you're going to find. It's not just adverse effects with respect to any environmental impact. It's four specific resources, municipal water supplies, shellfish beds and fishery areas, wildlife and recreational areas. And the notion that that is somehow a capacious grant of authority that takes into account The word unacceptable is capacious. The idea being if there's some effect, adverse effect, but huge cost, then that's acceptable. Adverse effect. And if it's the same adverse effect and there's really no cost, well then it's unacceptable. The word unacceptable is a word of value judgment. What is unacceptable? So unacceptable here is modified by adverse effect on wildlife. So it's not as though the statute said EPA shall withdraw whatever is unacceptable. My point is the same two cases, you have the same effects on wildlife. In one case, there's no cost. In the other case, it would cost a billion dollars to eliminate that adverse effect. In one case, you might say it's unacceptable. In the other case, you'd say it's acceptable because it would cost too much to get rid, to eliminate that adverse effect, to mitigate that adverse effect. Isn't that a common use of the term unacceptable? Well, first of all, Your Honor. I don't see how you can determine something unacceptable without thinking about the universe of facts and circumstances. First of all, this is just. Otherwise, you're just pinpointing, okay, there are going to be 10 animals affected. That's unacceptable. This is a discretionary authority, Your Honor. EPA does not have. That was true in Michigan, too, though. And the point the Supreme Court made was, yes, it's a discretionary authority, but you have to consider both sides of a ledger in making the decision. Not dictating how you balance those. The Supreme Court was careful about that. But at least take a pass at it. Well, I guess I would just say in Michigan, again, you had an open-ended grant of authority. And, in fact, the court specifically distinguished another part of the Clean Air Act that talked about adverse effects on the environment. Are you taking the position that the agency couldn't take into account these kinds of costs within the rubric of unacceptable? Because it seems if the agency issued a decision that said, we have to take into account the adverse effect on these four specific items, as you rightly point out, A, here's our itemization of what those effects are. B, we have to determine whether that is unacceptable. And in determining whether it's unacceptable, we're going to take into account costs to the particular company. You know, the amount of money that's spent and the number of jobs that are going to be canceled out as a result. Are you saying that that's something that the agency just can't do within the scope of the statute? Well, I guess I would distinguish between the determination whether there's been an unacceptable adverse effect on wildlife and the determination whether to act under Section 404C. Because, again, it's discretionary. So the administrator is authorized to act whenever he determines there's been an unacceptable adverse effect on wildlife. So I would say that in response to Your Honor's question, a determination whether there's been an unacceptable adverse effect on wildlife, the sorts of interests and, again, non-existent evidence that my opponents are pointing to, is not something that would be taken into account. It's not something that would be, but it's something that could be. I guess I'm just trying to understand whether you think that the statute would actually preclude the decision-maker from taking into account these things because the word unacceptable just doesn't accommodate that? I don't think that the word unacceptable in this context, where it's unacceptable adverse effect on wildlife, is dependent on this sort of cost-benefit balance. You're not answering the question. Does it preclude the agency from doing it? And I think your position on that is yes, because it's specifically focused on wildlife and the other things you mentioned. And you can't, under your theory, consider the cost. Well, Your Honor, I guess I would point back to the preamble in EPA's 1979 regulations, where they went through and explained how EPA interpreted this. And keep in mind, we're in Chevron land here. So in order to prevent— That was true in Michigan as well. I mean, it really does come back to how you read the—that was the whole argument in Michigan, as you know. And it really comes back to what's the nature of the word unacceptable. Well, again, we're looking at unacceptable. I think our textual argument, I think, were quite clearly on the Whitman side of the line here. But I would also point out, again, just to get back to the fact that this really was not— I'm going to interrupt you one second. State Farm says to consider all important aspects of the problem. And doesn't the problem here concern both the environmental benefits and the money expended in reliance on the permit? The problem for EPA in determining whether there are unacceptable adverse effects on wildlife concerns the environmental aspects of the problem. That's how EPA reasonably interprets the statute. And I would also say that, again, look at JA 866 and the study that EPA prepared. This is the penultimate document in Volume 1 of the Joint Appendix, where EPA looked at this and said, Look, Mingo Logan, even though we're withdrawing the specifications of these particular sites, you can discharge into this other site and not have these sort of drastic economic effects that Mingo Logan's talking about. And Mingo Logan came back and its parent company said, Well, we might still be able to profit from this mine, but we wouldn't get the specific rate of return that our investors wanted. Well, I don't think that's what FOX is referring to when it refers to serious reliance interests that must be taken into account. And my point is simply that the record in this case does not support the argument that my opponents are making. Now, if unacceptable, under your theory, to pick up on Judge Trinovacian's question, could be read to encompass consideration of cause. Isn't it unreasonable if it could be read to encompass consideration of cause? Isn't it unreasonable not to consider cause? Well, not where they're not in the record. How about the theoretical question? The theoretical question, I mean, I think it goes into, if you look at the 404B1 guidelines, they speak of practicable alternatives. And I suppose there's a manner in which, again, this is in the EPA's preamble in the 1979 regulations, there's a manner in which cost could come into play in relation to a determination whether they're practicable alternatives. As EPA indicated in its final decision in this case, there were practicable alternatives available, and Mingo Logan's only response in its reply brief is, well, we didn't think those were practicable. Again, that's not in the record. They haven't indicated why they think that EPA's analysis was incorrect. And that's reviewed for substantial evidence. One way to think about it as a theoretical matter, just putting to one side the question of whether it was adequately flagged or the agency had enough information before with which to make a cost assessment, is that the core regulations have been the part of a great deal of discussion in the briefing. So I take the point that the agency makes that, well, that's the core's regulations. We don't have to have the same regulations. That's true, but then the question becomes, could you? Could you essentially adopt what the core has said would be its governing determinations in this arena under the rubric of the EPA's 404C authority? Well, certainly given that it's a discretionary authority, there are any number of considerations when determining whether to exercise its discretionary authority that EPA could take into account, resource constraints, and so forth, that have nothing to do with environmental effects. And we're not suggesting that. So if you could take into account the core's considerations, then it seems to me the answer to your question on whether 404C would allow you to take into account costs would be yes. In acting under 404C, yes. But, again, I want to distinguish between the action under 404C and the specific scientific determination whether there's been an unacceptable adverse effect. But if it allows you to take into consideration costs, isn't it unreasonable not to do so? That's what Michigan says. Again, Your Honor, I think you're – Michigan says reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions. Again, we have two separate questions here. One is whether an unacceptable adverse effect on the four listed resources, whether the term unacceptable encompasses cost. And on that, our answer is no. We don't think it does. But then we have the separate question whether EPA has the discretionary authority to act under 404C in any given circumstance. And that's going to – the question whether EPA could take into account particular costs in deciding as a policy matter we're going to act here, we're not going to act here, is a separate issue. But I think just to hold, as a matter of statutory interpretation, that the term is authorized necessarily encompasses this kind of cost-benefit balancing would go far beyond what Michigan held. And the court particularly should be loath to do that in a context where, again, as here, it's not in the record. So I want to get back, though, to the downstream effects and just point out, again, we're going to rest on our briefs on the – within the footprint of the fill. I don't think that was – it wasn't discussed much in the opening argument. I think our argument is quite clear on that, that we think there was substantial new information. There's no dispute, Your Honor, that at this point that there was substantial new information regarding the severity of the adverse effect on wildlife downstream of the fill – footprint of the fill. And that's 2008 post. There are all sorts of studies on that. Mingo Logan has not contested that. So I want to make clear that is not in dispute, the severity of the adverse effect downstream. What's only in dispute, at least in the briefing, is the statutory question, whether EBA is permitted to consider that. And the tortured reading of the statute that Mingo Logan sets forward was properly rejected by the district court because it's quite clear from the structure of the Clean Water Act that state water quality standards are a floor, not a ceiling. That's been clear both in the text of the act and EPA and the Corps is implementing regulations. And to hold that those regulations are impermissible just would be going too far, we would argue, for the court. If the court has no further questions, I'll yield. Thank you. Your Honor, just a few basic – three basic points in rebuttal. First of all, my friend from the EPA has sort of suggested that, you know, there were alternatives within the permit. There were other specification sites. I think that's – if that were correct, I mean, I think that would be part of the analysis that the EPA should take into account, which is to say if you have a different hypothetical case where the post-permit withdrawal specification only addresses 12 percent of the disposal sites specified in the permit, that might be relevant. But this is 88 percent. And it's also a context where you don't have to wonder whether EPA itself viewed its actions here as a de facto permit revocation because their first move was to go to the Corps and ask the Corps to revoke the permit. So we're not imagining that revoking 88 percent of the specification here is a close substitute for revoking the permit in the facts and circumstances of this case. But all of that could be part of the analysis. Now, when we went to the Corps and the EPA had put the issue live to the Corps about revoking the permit, and we were making our argument to the Corps there, and you'll see this at Joint Appendix page 314 to 318, since we had the Corps' regulation in front of us, we talked about our reliance interests. And to be clear, this idea that, you know, I mean, we did account for the fact there was ongoing litigation, and so we didn't immediately start using these sites. But we did when we built this facility. We built all of the infrastructure to accommodate the idea that we were going to use 100 percent of the disposal sites. And if we had somehow known in advance that we were only going to be able to use 12 percent of the disposal sites, I don't know whether this project would have gone forward at all, but we certainly would have designed the infrastructure differently. So, you know, I think it's proof positive that when the agency was willing to essentially take reliance interests into its account, we weren't shy about sort of putting those front and center. It's just that when we were dealing with the EPA, we had no reason to think, other than putting it as the background for the whole presentation, that they were even going to be receptive to the idea of taking specifics. And as they tell you today, you know, they can't have it both ways. They can't say we needed to do more and that they already accounted for our reliance interests. I think we did sort of put that. I really don't think it's credible for EPA to think that we didn't have our reliance interests front and center. And the last thing I'd just end with is, and this gets to both the basic point we've been stressing, but also the downstream effects. This EPA, if it's going to behave rationally in this context, acting both post-permit and in a context where the state has the 402 authority, ought to start its analysis of the whole thing with the reality that the Corps has already issued this permit in a process where the EPA could have exercised a veto and didn't, and here are all of the reasons why what was black then is white now. That's where the whole thing should have started. And then when it got to downstream water effects, the analysis should have started with the fact that West Virginia had issued a 402 permit for this very site. And one thing to keep in mind in that regard is that, I mean, you know, and this is really more of an arbitrary and capricious argument than a pure statutory argument, but the 404C is written generically to cover jurisdictions where the state doesn't have the permitting authority under 402 yet, which was the situation like in Alaska, in Corps Alaska, and situations where there's been the elaborate process where the permitting authority has been delegated to the state. And it just seems to me, to avoid arbitrary capriciousness, when you're going to posit that there are adverse, significantly adverse downstream effects, you have to at least explain why the 402 permit is not an obstacle to that conclusion. There could be things that the permitting process just doesn't take into account, but you'd want an agency, I think, to differentiate between the two to make this work as a sensible accommodation of cooperative federalism. Thank you, Your Honor. Thank you. The case is submitted.
judges: Henderson, Kavanaugh, Srinivasan